M'GREGOR & DARLING versus HALL.

1. Where an affidavit, filed under the statute, by a claimant of property, levied on, under execution, used the words "just claim"—held, sufficient.
2. The act of 1828,[*] requiring the recording, within thirty days, of all deeds and conveyances of personal property, embraces within its spirit and intention, mortgages of personal property.
3. Where a mortgage of personal property, regularly acknowledged, was left in the proper office, with a *bona fide* intention to be recorded, five days before the expiration of the thirty days, but which, by the act of the clerk, was not recorded, until two days after the thirty days had expired—held to be a compliance, substantially, with the statute.
4. The interest of a mortgagor, in the mortgaged property, may legally be levied on, and sold, under execution at law.

In error, from Jefferson Circuit court.

This was a proceeding, under the statute, to determine the property in certain slaves, levied on, under execution, as of the estate of one Baylor; a claim to which had been interposed, by the defendant in error. On the trial, a verdict was had, in favor of the claimant; and the plaintiffs in execution, took a writ of error, here.

By a bill of exceptions, it appeared, that when the said case came on for trial, it was objected, that

[*] *Vide* Aikin's Digest, page 203, §5.

the affidavit filed by the claimant, was not sufficient, in its terms, to sustain his claim; the said affidavit only setting out, that the claimant had, a "just claim," to the slaves, levied on; and, it was thereupon moved, to quash the proceedings, which motion, the court refused.

*It also appeared, that the slaves, levied on, had been in the possession of the defendant in execution, for several years;* and that a mortgage thereof, had been executed, to the defendant in error, on the 28th day of October, 1830; on which deed of mortgage, the said claimant supported his claim:

It was objected, to the said mortgage, on the part of the plaintiffs in error, that the same had not been recorded, in the manner prescribed by the act of 1828; and, so was void, and fraudulent, in respect to creditors: and, on this point, it was in proof, that the mortgage had been deposited in the proper office, for record, five days before the expiration of the thirty days, but was not entered of record, until the thirty-second day, after the execution of the deed. The court overruled the objection to the registration of the deed, and ruled, that it was to be considered as recorded from the time it was proved, and deposited in the clerk's office.

It was further insisted, on the part of the plaintiffs in execution, that they had a right to sell the property mortgaged, subject to the rights of the mortgagee; but the court charged, that the interest of the mortgagor, could not be sold, under an execution at law.

All which opinions of the court, were excepted to.

*Peck,* for plaintiff—*Shortridge, contra.*

M'GREGOR & DARLING *vs.* HALL.

TAYLOR, J.—A judgment had been obtained against a third person, and, an execution, which was sued out thereon, was levied on two slaves. The defendant in error claimed said property, and made an affidavit, in the words following, viz: "Personally appeared, Samuel W. Hall, who being duly sworn, deposeth, and saith, that he has a just claim to Walker, a mulatto man, aged about fifty years, and to Catey, a black woman, about the same age, levied on," &c. The execution was thereupon returned; and, at the next term of the court, an issue was formed, according to the statute, to ascertain, whether the property was liable to the execution, or, of right, belonged to the defendant in error. Upon that trial, the jury found in favor of the claimant; but, during the progress of the trial, various exceptions were taken, to opinions, delivered by the court.

Some of the objections made below, have not been relied upon, in the argument in this court; and, therefore will not be noticed, in this opinion.

The first point made by the counsel for the plaintiffs in error, is, that the affidavit of claim, is insufficient.

The first act, which was passed, authorising this proceeding, is to be found in Toulmin's Digest, p. 310. So much of the act, as relates to the affidavit, is in these words. "Where any sheriff shall levy execution on property claimed by any person, not a party to such execution, such person may make oath to such property," &c. The first section of the act, entitled, "an act, the better to provide for the trial of the right of property; and for other purposes," passed in January, 1828, begins thus, " It shall be the duty of the sheriff to prepare a bond, whenever pro-

perty levied on, by him, shall be claimed, and affidavit made," &c.

These are the only provisions, specially relating to the affidavit; and they certainly are abundantly vague and uncertain. By the first statute a written affidavit is not expressly required : the claimant was to "make oath to the property." In respect to what was this oath to be made? To the identity of the property? This could not be, because that would have given him no right to interfere with the proceedings of the sheriff, upon the execution. It must, then, have related to his interest in it, and the proper affidavit would have been, that the property which was levied on as that of another man, was his, or equivalent words. The statute of 1828, has no effect in altering the nature of this oath, but evidently refers to the law previously in existence on that subject, the words are, "whenever property levied on by him shall be claimed, *and affidavit made*"— How made? As required by the first statute. But, do the words used in the present instance, substantially comply with the requirements of the law? The claimant deposed, that he had "a just claim" to the negroes in controversy. This, although not so definite as it might have been, yet, when the uncertainty of the statute is considered, is believed to be a sufficient compliance with it. In swearing that he has a "*just claim*," we must believe the affiant meant a title not founded in fraud; not set up to defeat the better titles of others; but one that he considered good, though it could be viewed only as a *claim*, because, in the necessity of making the affidavit, he had abundant proof that his title was controverted, and that he must resort to the courts of justice to establish it.

M'GREGOR & DARLING *vs.* HALL.

The second point is, that the deed of mortgage is fraudulent as to creditors, because it was not recorded as the statute requires.

The act of January, 1828, entitled "an act more effectually to prevent frauds and fraudulent conveyances, and for other purposes," declares, "that, hereafter, all deeds and conveyances of personal property, in trust, to secure any debt, or debts, shall be recorded in the office of the clerk of the county court, of the county wherein the person making such deed or conveyance, shall reside, within thirty days, or else the same shall be void against creditors and subsequent purchasers, without notice."

There can be no doubt but that a conveyance of slaves is a conveyance of personal property ; and just as little, that motgages are included within the meaning and intention of the legislature. The object of the act is to give notice to the world of the liens which are held on property, by persons out of possession, so as to prevent credit from being given to the holders, on account of the possession of it. Our courts have uniformly decided that a mortgage, or deed of trust, honestly executed, to secure the payment of a *bona fide* debt, to be paid *in futuro*, was valid, although the mortgagor, &c. was left in possession of the property, and that it was not necessary for the mortgagee, or trustee, to take possession even when the day of payment arrived, to secure the interest of the creditor. Although these decisions are believed to be strictly legal, and in accordance with the soundest policy, yet it is certain that it behooved the legislature to throw every guard around the honest members of the community, that was possible,

to protect them from the arts and combinations of the fraudulent. The act of 1828 was, therefore, passed, requiring all persons holding the liens, to take such steps as were calculated to give notice of them to others, by having them recorded in the several offices prescribed by law for that purpose. Every reason which could have influenced the general assembly to provide, that deeds of trust to secure debts, should be registered, operates in an equal or greater degree, with respect to mortgages. From the nature of the instruments, the execution of the former is generally attended with more notoriety than that of the latter. The circumstance that an indifferent person is made a party to a deed of trust, in addition to the debtor and creditor, while to a mortgage the latter only are parties, is, in itself, highly calculated to cause its existence to be more known. Deeds of trust, long before the enactment of the act of 1828, had become much the most common mode of securing creditors, and to this is to be ascribed their having been particularly named.

In this case, however, the mortgage was regularly acknowledged, and left in the proper office, and with the proper officer, to be recorded, some four or five days before the thirty had expired, but was not recorded until the thirty-second day after its execution; which, it is contended by the defendant, was, on his part, a full compliance with the requisitions of the law, and that he is not to suffer from the failure of the clerk to perform his duty. It is insisted, on the other side, that here is no compliance with the law; that unless the deed was actually recorded, the act of assembly makes it void as to creditors; that it was the duty of the mortgagee, to see that the clerk

performed his duty, and if the officer has failed, he he must look to him for redress.

Acts of assembly must always receive a reasonable construction, and to give them this construction, it is necessary to ascertain the motive of the law giver. It will not do to be governed uniformly by the literal expressions of a statute; by doing so, we should, many times, wander entirely from the obvious intention of the legislature. We have already seen an instance of this, in the case before us. A literal construction would exclude mortgages from the operation of the statute we are now considering; by such construction, however, the courts would not afford a remedy commensurate with the injury which it was intended to redress. So, as respects the recording, it was intended to give notice of the execution of the instrument. If the party in interest does all that he can to give such notice, especially if the act done be equivalent to the one required towards effecting that object; it would be wrong to injure him for the negligence of an officer who has been regularly appointed, according to the laws of the land, for the purpose of discharging this duty, and may, therefore, be viewed, in some measure, as chosen by the parties to the instruments legally deposited with him, for the especial purpose of putting them upon record. But, when an instrument is left with a clerk to be recorded, it, probably, has all the effect of notice, that actually registering it affords. Persons who wish information on the subject, apply, of course, to the clerk, and it is presumable, that he would give the information, as well with respect to such deeds as were in his office, but had not been, as those which had been registered.

If, however, it should appear that the mortgagee,

, &c. interfered, in any way, to prevent or postpone the recording of the deed, this would render the foregoing reasoning totally inapplicable to the case, and such deed would occupy the same situation that it would have done had it not been handed into the office.

The case of *Hodgson vs. Butts,*[a] is cited by the plaintiff in error, on this point; but it is not perceived that it affords him any material aid.

In that case, the principal, and, in fact, only thing to be determined, was, whether a mortgage of chattels came within the provisions of a statute, which declared that all deeds embraced within it, should be void as to creditors, &c., unless acknowledged, or proved by three witnesses. The deed then before the court, had been witnessed and proved by only two witnesses. No act could be done equivalent to a third witness. The court decided that the words, "all deeds of trust and mortgages, whatsoever," included mortgages of chattels, although the general object of the act was to regulate the probate, &c. of deeds conveying real estate; but it was said by the court, that the construction was, in a great measure, produced from there being no other law in Virginia, making provision for the registering of mortgages of chattels, and from the previous decisions of the courts of that State on the subject.

The case of *Foster vs. Beekman,*[b] it is admitted, sustains the plaintiffs in error. The laws of New York require, that mortgages, &c. shall be registered, within a given time; otherwise, they are declared to be void, as to creditors, &c. The mortgage in question, in the case, had been duly executed and proved, and left at the proper office, and with the proper

,officer, to be recorded.. It was made to secure a debt of three thousand dollars; but, by mistake, was copied into the record book, for three hundred dollars. The Chancellor, (*Kent,*) decided, that it could only operate as a security for three hundred dollars : that it was the duty of the mortgagee to attend to its being correctly recorded, and see that the officer did his duty.

I entertain the utmost deference, for the opinions of Chancellor *Kent;* and would hesitate long, if unsupported, by very respectable authority, before I could venture to give one, in opposition to his. It does appear to me, however, that he has taken a position, in this instance, which cannot be sustained.

Anterior to the registry acts, deeds were effectual, without being recorded.—These acts, while they have required, that they should be recorded, have pointed out public officers, to the parties, as those who were to perform that duty ; and have required of the parties interested, to have the deeds executed and regularly proved, preparatory to their being admitted to registration. Are they to step in, between the public officer, and his duty to the State, and register them, themselves? What right would they have, to do this? Or, are they to neglect their own business, to attend to another, while he does his? I should think not.

By tracing this case of *Foster* vs. *Beekman*, we find it, afterwards, before the court of errors, by appeal,[a] where the opinion of the Chancellor, on this point is pronounced to be erroneous, and, his decree, for that cause, reversed—the court, correctly, declaring, that the party to an honest conveyance, who has

[a] 18 John.R. 544

faithfully discharged his duty, shall not be injured, by the mistake of the registering officer.

The third point raised, in this case, is, whether, or not, the mortgagor's interest was subject to be sold under the execution; the Circuit court having charged the jury, that it could not; but, that the plaintiffs must resort to equity, to reach it.

The ancient doctrine certainly was, that the interest of the mortgagor, was altogether equitable, in its nature; that the mortgagee was vested with the legal estate, in the property conveyed; and, that a court of law, could not touch the interest of the mortgagor. This doctrine has been gradually giving way, for nearly a century, both in England and in this country.

Upon many subjects, the law has followed in the footsteps of Chancery, until, where the former could, anciently have given no relief, it now, in manifold instances, affords, ample redress: and, probably, no peculiar jurisdiction of chancery, has been more innovated upon, than the interest of a mortgagor, in the mortgaged premises.

In the early days of English jurisprudence, the hard rule prevailed, that, if the money secured by the mortgage, were not paid, when due, the mortgaged property, no matter how disproportioned its value to the debt, was vested in the mortgagee, and all the rights of the mortgagor were gone. But, equity interposed, to prevent this extreme injustice; and, though the law day had passed, compelled the mortgagee to reconvey, upon receiving the debt, and interest.

So early as 1681, Lord *Nottingham* held, in the case of *Newcomb* vs. *Bonham*;[a] in which case, there was a covenant, that, if the lands were not redeem-

[a] 1 Vern. 7.

ed, in the mortgagor's lifetime, they never should be; "that the estate was redeemable by the heir, notwithstanding the agreement." The same doctrine is sustained, in all the later cases, both in this country, and England.

Chancellor *Kent*, in the fourth volume of his luminous Commentaries, (page 153,) says, "the equity doctrine is, that the mortgage is a mere security for the debt, and, only a chattel interest; and that, until a decree of foreclosure, the mortgagor continues the real owner of the fee. The equity of redemption is considered the real and beneficial estate, tantamount to the fee, at law; and, it is, accordingly, held, to be descendible, by inheritance, divisable, by will, and alienable, by deed—precisely, as if it were an absolute estate of inheritance, at law. The courts of law have, also, by a gradual, and insensible progress, adopted these equitable views of the subject, which are founded in justice, and accord with the true intent, and inherent nature of every such transaction. Except, as against the mortgagee, the mortgagor, while in possession, and before foreclosure, is regarded as the real owner; and a freeholder, with the civil and political rights belonging to that character; whereas, the mortgagee, notwithstanding the form of the conveyance, has only a chattel interest, and his mortgage is a mere security for a debt.— This is the conclusion, to be drawn, from a view of the English and American authorities. The equity of redemption is not liable, under the English law, to sale or execution, as real estate. But, in this country, the rule has very extensively prevailed, that an equity of redemption, was vendible, as real property,

on an execution, at law ; and, it is also chargeable with the dower of the wife of the mortgagor."

In the case of *Jackson, ex dem., Norton & Burk,* vs. *Willard,*[a] it was decided, that the interest of a mortgagee, in lands, even after a failure to pay, cannot be sold, under an execution at law. It was said, in that case, that, in modern cases, courts of law are inclined to look upon a mortgage, as a mere security for a debt."

In the case of *Richards* vs. *Sims,*[b] Lord *Hardwick* uses much the same language, and said, " that, a discharge of the debt, even by parol, was considered as a discharge of the mortgage."

In New York, it has often been determined, that the equity of redemption is subject to be sold, under execution, at law.[c]

In the case of *Huntington* vs. *Smith,*[d] it is decided, that the interest of the mortgagee, after the expiration of the law day, and before foreclosure, can not be taken in execution ; " that the fee simple of the land, is in the mortgagor."

In *Clark* vs. *Beach,*[e] the estates held by the mortgagor and mortgagee, are discussed at great length; and, it is shown, that, both from reason and authority, the mortgagee has only a chattel interest, during the possession of the mortgagor, and before foreclosure: and, although it is not expressly determined yet, the inference is irresistable, that in that State, the interest of the mortgagor may be sold by execution.

*Kent,*[f] says, that New Hampshire would appear to form an exception to the general practice of selling an equity of redemption, on execution, at law.

It would, therefore, seem to be the prevalent doc-

M'GREGOR & DARLING vs. HALL.

trine, in the States of this Union, that the interest of the mortgagor may be levied upon and sold, by execution at law. The cases which have been examined, it is true, relate, generally, if not entirely, to mortgages of real estate; and, it is seen, as was contended for, by the counsel for the defendant in error, that inconvenience may sometimes arise, from extending the doctrine to personal property, particularly slaves. Although mortgaged to one person, they may be sold to several, who may be altogether careless of the interest of the mortgagee; and he may be compelled to guard his interest, in the hands of many, in whom he has no confidence, instead of one, in whom he had much. No distinction, however, is known to have been made, in this respect, between personal, and real estate; and they have several times been determined to stand upon the same footing.[a]

[a]1Pick.399 —3 Stew't &Porter92

And, although the rule may, sometimes, produce inconvenience, to the mortgagee, yet, a contrary one would often produce much greater, to other creditors. A man, possessed of much personal property, might mortgage it, for greatly less than its value, to one or two creditors, postponing the day of payment a considerable time, and compel a multitude of others, to resort to the slow, and expensive course of suits in chancery; or, especially if their debts were small, cause them to sit down quietly under the loss.

From the proof, in this case, it appears, that the mortgage was executed, only three or four days before the judgment of the plaintiffs was obtained; that the property, mortgaged for about one hundred and eighty dollars, was worth upwards of three hundred dollars; and the day of payment, specified in

the mortgage, was fifteen months off, or thereabouts. Is it right, that a debtor should be entitled to the use of his property, under what all the modern decisions consider, a clearly legal title, for a year or more, because it is mortgaged property, too, worth much more than the debt it was conveyed to secure—while the creditor must either look on, without redress, or engage in the tedious and expensive litigation, consequent upon a suit in chancery? And, might it not be asked, what good would result, in a case like the present, from a resort to chancery?

It has been correctly argued, by the plaintiffs' counsel, that the expenses would consume a great part of the property : so much, that it it would, probably, by the time the suit was terminated, not more than pay the mortgage debt, and costs.

And, how often might the property, when inconsiderable in value, but sufficient, when sold, under execution, to pay both creditors, be so much exhausted, by the expenses of a chancery suit, as fully to satisfy neither.

We, therefore, think, the interest of the mortgagor was liable to be sold, under the execution; and, that the Circuit court, in instructing the jury, that this could not be done, erred—for which, the judgment is reversed, and the cause remanded.